IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

TANYA RENEE MONTGOMERY,

      **Plaintiff,**

    vs.                                              Civ. No. 17-526 SCY

NANCY A. BERRYHILL, Acting
Commissioner of the Social Security
Administration,

      **Defendant.**

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 16)[2] filed August 3, 2017, in connection with Plaintiff's *Motion to Reverse and Remand for Rehearing, With Supporting Memorandum,* filed November 3, 2017. (Doc. 21.) Defendant filed a Response on January 19, 2018. (Doc. 24.) And Plaintiff filed a Reply on February 2, 2018. (Doc. 25.) The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c). Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds that Plaintiff's motion is well taken and shall be **GRANTED**.

### I. BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Tanya Renee Montgomery (Ms. Montgomery) alleges that she became disabled on December 27, 2011, at the age of thirty-four, because of blood clots in her heart and lungs,

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case. (Docs. 3, 8, 9.)

[2] Hereinafter, the Court's citations to Administrative Record (Doc. 16), which is before the Court as a transcript of the administrative proceedings, are designated as "Tr."

1

fatigue, depression, anxiety, attention deficit disorder, and stomach ulcers. (Tr. 313, 325.) Ms. Montgomery completed four or more years of college in 2001, and worked as a Verizon customer service representative, apartment property manager, and county office worker. (Tr. 326, 334-37.) Ms. Montgomery's date of last insured is December 31, 2019. (Tr. 19, 21.)

Ms. Montgomery protectively filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 *et seq.*, on November 13, 2012. (Tr. 267-73, 313.) Ms. Montgomery's application was denied at the initial level (Tr. 125-34, 135), and at reconsideration (Tr. 136-49, 150). Upon Ms. Montgomery's request, Administrative Law Judge (ALJ) Myriam C. Fernandez Rice held an initial hearing on March 25, 2015. (Tr. 109-120.) Ms. Montgomery decided, however, to postpone the hearing because she wanted to secure legal representation before proceeding. (*Id.*) On September 3, 2015, ALJ Fernandez Rice conducted a second hearing. (Tr. 34-63.) Attorney Gary Martone represented Ms. Montgomery at that hearing. (*Id.*) On October 15, 2015, ALJ Fernandez Rice issued a written decision concluding that Ms. Montgomery was "not disabled" pursuant to the Act. (Tr. 16-28.) On March 7, 2017, the Appeals Council denied Ms. Montgomery's request for review, rendering ALJ Fernandez Rice's October 15, 2017, decision the final decision of Defendant the Commissioner of the Social Security Administration. (Tr. 1-6.) Ms. Montgomery timely filed a complaint on May 5, 2017, seeking judicial review of the Commissioner's final decision. (Doc. 1.)

## II. APPLICABLE LAW

### A. Disability Determination Process

A claimant is considered disabled for purposes of Social Security disability insurance benefits or supplemental security income if that individual is unable "to engage in any substantial

2

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Social Security Commissioner has adopted a five-step sequential analysis to determine whether a person satisfies these statutory criteria. *See* 20 C.F.R. §§ 404.1520, 416.920. The steps of the analysis are as follows:

(1) Claimant must establish that she is not currently engaged in "substantial gainful activity." If Claimant is so engaged, she is not disabled and the analysis stops.

(2) Claimant must establish that she has "a severe medically determinable physical or mental impairment . . . or combination of impairments" that has lasted for at least one year. If Claimant is not so impaired, she is not disabled and the analysis stops.

(3) If Claimant can establish that her impairment(s) are equivalent to a listed impairment that has already been determined to preclude substantial gainful activity, Claimant is presumed disabled and the analysis stops.

(4) If, however, Claimant's impairment(s) are not equivalent to a listed impairment, Claimant must establish that the impairment(s) prevent her from doing her "past relevant work." Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [Claimant] can still do despite [her physical and mental] limitations." 20 C.F.R. § 404.1545(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* § 404.1545(a)(3). Second, the ALJ determines the physical and mental demands of Claimant's past work. Third, the ALJ determines whether, given Claimant's RFC, Claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled and the analysis stops.

(5) At this point, the burden shifts to the Commissioner to show that Claimant is able to "make an adjustment to other work." If the Commissioner is unable to make that showing, Claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005).

B. <u>**Standard of Review**</u>

A court must affirm the denial of social security benefits unless (1) the decision is not supported by "substantial evidence" or (2) the ALJ did not apply the proper legal standards in reaching the decision. 42 U.S.C. § 405(g); *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 800-01 (10th Cir. 1991). In making these determinations, the reviewing court "neither reweigh[s] the evidence nor substitute[s] [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008). For example, a court's disagreement with a decision is immaterial to the substantial evidence analysis. A decision is supported by substantial evidence as long as it is supported by "relevant evidence . . . a reasonable mind might accept as adequate to support [the] conclusion." *Casias*, 933 F.3d at 800. While this requires more than a mere scintilla of evidence, *Casias*, 933 F.3d at 800, "[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

Similarly, even if a court agrees with a decision to deny benefits, if the ALJ's reasons for the decision are improper or are not articulated with sufficient particularity to allow for judicial review, the court cannot affirm the decision as legally correct. *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). As a baseline, the ALJ must support his or her findings with specific weighing of the evidence and "the record must demonstrate that the ALJ considered all of the evidence." *Id.* at 1009-10. This does not mean that an ALJ must discuss every piece of evidence

in the record. But, it does require that the ALJ identify the evidence supporting the decision and discuss any probative and contradictory evidence that the ALJ is rejecting. *Id.* at 1010.

### III. ANALYSIS

The ALJ made her decision that Ms. Montgomery was not disabled at step five of the sequential evaluation. (Tr. 27-28.) The ALJ determined that Ms. Montgomery met the insured status requirements of the Social Security Act through December 31, 2019 (Tr. 21), and that she had not engaged in substantial gainful activity since December 27, 2011, the alleged onset date. (*Id.*) She found that Ms. Montgomery had severe impairments of recurrent pulmonary emboli associated with ventricular thrombosis, depression, attention deficit disorder, and anxiety disorder.[3] (Tr. 21.) The ALJ determined, however, that Ms. Montgomery's impairments did not meet or equal in severity one of the listings described in the governing regulations, 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 22-23.) Accordingly, the ALJ proceeded to step four and found that Ms. Montgomery had the residual functional capacity to perform a wide range of light work as defined in 20 C.F.R. § 404.1567(b). The ALJ found that Ms. Montgomery

> can lift up to 20 pounds occasionally; lift and/or carry up to 10 pounds frequently; can stand and/or walk up to six hours per eight-hour workday; and can sit for up to six hours of an eight-hour workday. She can never climb ladders, ropes, or scaffolds; should avoid even moderate exposure to the use of moving machinery and to unprotected heights. She is able to maintain, understand, and remember simple work instructions with occasional changes in the work setting. She is limited to work that requires only occasional contact with the public and co-workers.

(Tr. 24.) The ALJ concluded at step four that Ms. Montgomery was unable to perform her past relevant work as a customer service operator. (Tr. 27.) At step five, the ALJ determined that

---

[3] The ALJ discussed Ms. Montgomery's history of duodenal ulcer disease with previous gastrointestinal bleed. (Tr. 21.) The ALJ found that "this impairment did not last, nor was it expected to last for 12 months. The issue quickly resolved and no longer interferes with the claimant's ability to perform basic work-related activities. Thus, this impairment is not a severe impairment for Social Security purposes." (*Id.*)

5

based on her age, education, work experience, RFC, and the testimony of the VE, that there were jobs existing in significant numbers in the national economy that Ms. Montgomery could perform. (Tr. 27-28.)

Plaintiff argues that: (1) the ALJ failed to correctly apply the treating physician rule to the opinions of Clark E. Haskins, M.D.; and (2) the ALJ failed to properly evaluate the opinion of examining State agency psychological consultant Louis Wynne, Ph.D. (Doc. 9-13.) Because the Court finds that the ALJ committed legal error in her consideration of Dr. Haskin's opinions, the Court will reverse and remand for further proceedings consistent with this Opinion.

### A.  The ALJ Failed to Properly Evaluate and Weigh Treating Physician Haskins' Medical Opinions

Ms. Montgomery argues that the ALJ failed to apply the correct treating physician rule in evaluating Dr. Haskins' medical opinions. (Doc. 21 at 9-12.) In support, Ms. Montgomery asserts that the ALJ failed to recognize the extent of Dr. Haskins' treatment notes and the volume of laboratory tests he ordered on her behalf. (*Id.*) Ms. Montgomery further asserts that the ALJ improperly relied on certain of her reported daily activities, while ignoring others. (*Id.*) Finally, Ms. Montgomery asserts that the ALJ failed to consider the regulatory factors in weighing Dr. Haskins' medical opinion evidence, as she was required to do. (*Id.*) The Commissioner contends that the ALJ properly explained that Dr. Haskins' opinions were inconsistent with the record as a whole. Further, the Commissioner argues that the ALJ properly found that Dr. Haskins failed to include any references to his treatment notes and opined on issues beyond his expertise as a hematologist. Finally, even though the ALJ did not indicate that she rejected Dr. Haskins' opinions because he opined on issues reserved to the Commissioner, the Commissioner argues that Dr. Haskins addressed issues reserved to the Commissioner. (Doc. 24 at 13-16.)

6

### 1. **Relevant Medical Evidence**

Ms. Montgomery was referred for follow-up care to hematologist/oncologist Chris Haskins, M.D., after being admitted and treated for bilateral pulmonary emboli associated with ventricular thrombosis at the Heart Hospital of New Mexico in November 2010. (Tr. 390-97.) Dr. Haskins began treating Ms. Montgomery on November 17, 2010, for her pulmonary emboli and to manage her anticoagulation therapy. (Tr. 720-21.) On November 17, 2010, Ms. Montgomery reported chest discomfort, shortness of breath when she walked fast, fatigue and anxiety. (Tr. 720-21.) Dr. Haskins discussed Ms. Montgomery's INR[4] target measurement and managing her anxiety. (Tr. 721.) On December 16, 2010, Ms. Montgomery reported, *inter alia*, shortness of breath after walking about a half mile. (Tr. 717.) Dr. Haskins noted continued anticoagulation therapy and that an "MRI scan of her heart showed a question of increasing size of the lesion in her lung." (Tr. 718.)

Dr. Haskins followed Ms. Montgomery throughout 2011, seeing her seven times. (Tr. 698-700, 701-03, 704-06, 707-08, 709-10, 711-13, 714-16.) Ms. Montgomery consistently complained of fatigue, poor energy, shortness of breath with exertion, diminished physical strength, chest pain, and depression. (Tr. 698, 702, 706, 707, 712, 714.) Dr. Haskins referred Ms. Montgomery for physical therapy to increase her exercise tolerance, encouraged her to begin taking an antidepressant,[5] noted a normal echocardiogram, referred her for testing related to her shortness of breath,[6] and noted that Ms. Montgomery was seeing a psychiatrist for her

---

[4] The international normalized ratio (INR) is a laboratory measurement of how long it takes blood to form a clot. It is used to determine the effects of oral anticoagulants on the clotting system.
https://www.myvmc.com/investigations/blood-clotting-international-normalised-ratio-inr/.

[5] On March 15, 2011, Dr. Haskins noted that Ms. Montgomery was taking Zoloft. (Tr. 711.)

[6] Dr. Haskins referred Ms. Montgomery to Pulmonologist Jeffrey Dorf, M.D. Dr. Haskins noted on December 5, 2011, that Ms. Montgomery was "recently evaluated by Dr. Dorf, and it was felt that she needed no further workup and encouraged her to slowly increase her level of activity." (Tr. 698.)

depression. (Tr. 702, 706, 711, 716.) In May 2011, Ms. Montgomery returned to work four hours per day.[7] (Tr. 708.) She reported in October 2011 that she thought she could return to work for five hours a day. (Tr. 704.) On December 5, 2011, Dr. Haskins assessed that Ms. Montgomery was "doing well," and that her hemoglobin and hematocrit levels were normal. (Tr. 699.) Dr. Haskins discontinued anticoagulation therapy.[8] (Tr. 700.)

Three weeks later, on December 29, 2011, Ms. Montgomery was admitted to Lovelace Medical Center with complaints of abdominal pain, nausea, and vomiting. (Tr. 446-48.) On December 30, 2011, she was diagnosed with an acute pulmonary embolus. (Tr. 454-46.)

Ms. Montgomery returned to Dr. Haskins on January 18, 2012. (Tr. 696-97.) He noted on that date that Ms. Montgomery would be on anticoagulation therapy for the rest of her life given the recurrence of pulmonary emboli. (T. 697.)

Dr. Haskins saw Ms. Montgomery five times in 2012. (Tr. 682-84, 685-86, 690-92, 693-95, 696-97.) Dr. Haskins' treatment notes reflect that Ms. Montgomery consistently complained of dizziness, headaches, numbness in her fingers and toes, sleeping problems, diminished physical strength, chest pain, shortness of breath with exertion, anxiety, depression, and memory loss. (Tr. 683, 686, 691, 694, 697.) On March 6, 2012, Dr. Haskins noted "I am not sure what her final exercise tolerance will be." (Tr. 694.) On May 1, 2012, Dr. Haskins assessed that Ms. Montgomery was "having ongoing issues with shortness of breath related to pulmonary

---

[7] Ms. Montgomery reported she was ultimately fired from her job because she was unable to return to work full time. (Tr. 757.)

[8] Dr. Haskins noted that Ms. Montgomery's initial episode of thrombosis was associated with oral contraceptives, which she was advised to discontinue, and that there were no other hypercoagulable abnormalities. (Tr. 699.) (Ms. Montgomery was later diagnosed with hereditary thrombophilia. (Tr. 25.))

8

dysfunction related to her pulmonary emboli," and that she was having ongoing issues with stress and anxiety. (Tr. 691.)

Dr. Haskins prepared three "to whom it may concern" letters in 2012 in which he rendered medical opinions regarding Ms. Montgomery's ability to do work-related activities. On April 25, 2012, Dr. Haskins wrote, in part, that Ms. Montgomery "has chronic difficulties with shortness of breath because of the recurrent pulmonary emboli and as such, her energy level and her ability to work will be limited in the future. It is difficult to say exactly when she will be able to return to work." (Tr. 537.) On August 1, 2012, Dr. Haskins wrote, in part, that Ms. Montgomery had had multiple episodes of pulmonary emboli and ventricular thrombosis and that, as a result, "she is having ongoing problems with shortness of breath and dyspnea with exertion. I do no think she will ever completely recover from this situation. However, over time her muscular strength may improve and her pulmonary status may also slowly improve." (Tr. 539.) Dr. Haskins also noted that Ms. Montgomery had chronic problems with depression and anxiety that were exacerbated by her pulmonary issues. (*Id.*) On November 27, 2012, Dr. Haskins wrote, in part, that Ms. Montgomery "has ongoing issues with shortness of breath," and that "[h]er overall level of energy is variable from day to day, and while some days she is doing well, other days she is not." (Tr. 538.)

Dr. Haskins saw Ms. Montgomery four times in 2013.[9] (Tr. 780-82, 783-84, 829-31, 852-53.) Dr. Haskins' treatment notes reflect that Ms. Montgomery complained of fatigue,

---

[9] On October 2, 2013, Ms. Montgomery was evaluated at Mayo Clinic for possible pulmonary arterial hypertension. (Tr. 835-36.) Provider Lynda S. Facchiano, R.N., C.N.P., did not find a specific cause for Ms. Montgomery's pulmonary hypertension or her subjective dyspnea. (Tr. 835.) RN Facchiano encouraged Ms. Montgomery to seek an evaluation by a psychiatrist for anxiety and depression because it may be adding to her dyspnea. (*Id.*)

On November 11, 2013, Ms. Montgomery was evaluated at the University of Colorado Hospital for possible pulmonary hypertension. (Tr. 822-26.) David B. Badesch, M.D., noted evidence of mild pulmonary hypertension on a previous echocardiogram. (Tr. 825.) He ultimately assessed that it seemed "unlikely that she has significant pulmonary hypertension. However, her recently elevated BNP level, as well as her symptoms, make it difficult to

9

weakness, shortness of breath, depression and anxiety. (Tr. 780, 783, 853.) On April 23, 2013, Dr. Haskins assessed that Ms. Montgomery "has ongoing issues with weakness and is unable to work at the present time." (Tr. 784.) On July 30, 2013, Dr. Haskins assessed that Ms. Montgomery continued to "not do well." (Tr. 853.) On October 15, 2013, Dr. Haskins assessed that Ms. Montgomery was doing "fair," and noted that she had been able to ride her bicycle "up to 13 miles," although it took her two hours to do so. (Tr. 830.)

Dr. Haskins saw Ms. Montgomery three times in 2014. (Tr. 810-12, 913-15, 926-28.) Dr. Haskins' treatment notes indicate that Ms. Montgomery complained of fatigue, depression, anxiety, and memory loss. (Tr. 810-11, 914, 926.) On August 26, 2014, Ms. Montgomery reported that her energy had picked up and she was able to ride her bicycle to the appointment. (Tr. 926.) On November 12, 2014, Ms. Montgomery reported that although her fatigue had worsened, she had been able to increase her level of activity so that she was able to ride her bicycle 26 miles with the "Day of the Tread."[10] (Tr. 914.) Dr. Haskins assessed that Ms. Montgomery had "ongoing issues with her breathing," "problems with fatigue," was "still struggling with her depression and lack of energy, some of which may still be attributable to her recurrent pulmonary emboli." (Tr. 812, 914.)

Dr. Haskins saw Ms. Montgomery twice in 2015. (Tr. 884-86, 1108-1110.) On February 25, 2015, Ms. Montgomery reported ongoing issues with loss of energy. (Tr. 885.) Dr. Haskins noted that "[i]t could be partly related to chronic lung disease from her pulmonary emboli," and that there was nothing specific to be done about it. (Tr. 885.) On September 10,

---

completely exclude this possibility. I suspect that her coping ability is significantly impaired by her anxiety and depression[.]" (Tr. 826.)

[10] Ms. Montgomery reported it took her quite a period of time, but she felt good about her accomplishment. (Tr. 914.)

2015, Ms. Montgomery reported, *inter alia*, ongoing issues with fatigue, occasional shortness of breath, and ongoing trouble with depression and anxiety. (Tr. 1109.)

On September 2, 2015, Dr. Haskins prepared a fourth "to whom it may concern" letter. (Tr. 1021.) Dr. Haskins discussed Ms. Montgomery's history of multiple pulmonary emboli associated with ventricular thrombosis, and opined that "[a]fter these life-threatening episodes, [Ms. Montgomery] has had problems with fatigue, memory loss, depression, and anxiety. She has been unable to work because of the limitations of her fatigue, memory loss, depression, and anxiety. She has seen a psychologist regarding these symptoms." (*Id.*)

### 2. **Discussion**

In response to Dr. Haskins' opinion that Ms. Montgomery has been unable to work, the Commissioner correctly points out that the determination of whether a claimant is able to work is "not a true medical opinion" and therefore is an assessment reserved for the ALJ. Doc. 24 at 14. Nonetheless, on multiple occasions during the five years he treated Ms. Montgomery, Dr. Haskins assessed her as suffering from fatigue, shortness of breath, depression, and anxiety. These medical assessments are within the purview of a treating physician, not an ALJ. In outright rejecting Dr. Haskins' opinions in favor of her own medical assessment, it was the ALJ who stepped into Dr. Haskins' lane. *See Kemp v. Bowen*, 816 F.2d 1469, 1476 (10th Cir. 1987) ("While the ALJ is authorized to make a final decision concerning disability, [s]he cannot interpose h[er] own 'medical expertise' over that of a physician, especially when that physician is the regular treating doctor for the disability applicant.").

It is undisputed that Dr. Haskins is a treating physician. Therefore, the ALJ was required to evaluate his opinions pursuant to the two-part treating physician inquiry. *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). First, the ALJ must determine whether the treating

physician's opinions are entitled to controlling weight. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Here, the ALJ "rejected" Dr. Haskins' opinions and so clearly did not give them controlling weight.

Second, if the treating physician's opinions are inconsistent with the record or not supported by medical evidence, the opinions do not merit controlling weight but still must be weighed using the following six factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003) (internal citations and quotations omitted); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). Not every factor is applicable in every case, nor should all six factors be seen as absolutely necessary. What is necessary, however, is that the ALJ give good reasons—reasons that are "sufficiently specific to [be] clear to any subsequent reviewers"—for the weight that she ultimately assigns to the opinions. *Langley*, 373 F.3d at 1119; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Branum v. Barnhart*, 385 F.3d 1268, 1275 (10th Cir. 2004).

While the ALJ did not go through each of the above factors (and, in particular, avoided those favorable to Ms. Montgomery), she did provide several reasons for rejecting Dr. Haskins' opinions. First, she explained that Dr. Haskins appeared to have based his opinions on Ms. Montgomery's subjective complaints because his treatment notes reflected no objective findings to support her claims and his examinations were completely normal. (Tr. 25.) Second, she noted that Ms. Montgomery reported working part-time at a restaurant, helping her parents

manage their properties, and riding her bicycle – all activities she found inconsistent with Dr. Haskins' opinions that Ms. Montgomery had limitations in her ability to do work-related physical activities. (*Id.*) Finally, the ALJ concluded that Dr. Haskins' opinions related to Ms. Montgomery's depression and anxiety were beyond his expertise. (*Id.*) As set forth below, however, the explanations the ALJ gives for completely rejecting the opinions of Ms. Montgomery's long-time treating physician do not comply with the Tenth Circuit's requirements in *Watkins* and are simply insufficient.

In concluding that Dr. Haskins' opinions have no objective basis, the ALJ failed to fully consider that Dr. Haskins began treating Ms. Montgomery in November 2010, shortly after she was admitted to the Heart Hospital of New Mexico and diagnosed with bilateral pulmonary emboli associated with ventricular thrombosis. Dr. Haskins noted an "MRI scan of her heart showed a question of increasing size of the lesion in her lung." (Tr. 718.) As a product of her objectively determined condition, Ms. Montgomery experienced, *inter alia*, shortness of breath, fatigue, anxiety, and depression. Approximately a year after Ms. Montgomery's initial diagnosis, and less than a month after Dr. Haskins discontinued Ms. Montgomery's anticoagulation therapy, Ms. Montgomery became sick, was admitted to Lovelace Medical Center, and was diagnosed with acute pulmonary embolus. Again, commensurate with this diagnosis, Ms. Montgomery experienced shortness of breath, fatigue, anxiety and depression. Thus, shortness of breath, fatigue, anxiety and depression have from the beginning been associated with Ms. Montgomery's objectively determined condition of pulmonary emboli stemming from hereditary thrombophilia.

Further, as Dr. Haskins continued to treat Ms. Montgomery after 2011, Ms. Montgomery continued to make the same complaints regarding shortness of breath, fatigue, anxiety, and

13

depression. Dr. Haskins, an expert in treating pulmonary emboli, specifically connected these complaints to Ms. Montgomery's episodes of pulmonary emboli. (*See* Tr. 537, 538, 539, 691, 694, 812, 885, 914, 1021.) [11] His treatment notes, and medical opinions, also indicated that Ms. Montgomery's pulmonary issues exacerbated her history of depression and anxiety, which in turn exacerbated her shortness of breath and fatigue. (Tr. 538, 539, 691, 812, 885, 914, 1021.) Moreover, even though other medical source evidence includes reports from examining physicians who could not definitively explain the cause for Ms. Montgomery's ongoing shortness of breath and fatigue, they nonetheless could not completely rule out the possibility of pulmonary hypertension,[12] and agreed with Dr. Haskins that depression and anxiety were playing a role in her pulmonary issues.[13] (Tr. 824-26, 835.) Given that Dr. Haskins specializes in pulmonary emboli and consistently treated Ms. Montgomery for this condition (Dr. Haskins saw Ms. Montgomery twenty-three times over the course of five years), he was well-positioned to opine about other conditions that can arise as a product of pulmonary emboli. Therefore, his opinions should not be easily dismissed. Yet, the ALJ completely discounted Dr. Haskins' medical opinions and largely did so by replacing them with her own.

---

[11] The ALJ stated that Dr. Haskins' physical exams were "essentially normal," but failed to discuss how normal physical exam findings were probative of Ms. Montgomery's shortness of breath, fatigue, depression and anxiety, which are the bases of Dr. Haskins' opinions.\* *See generally Praytor v. Commissioner*, SSA, ___ F. App'x ___, 10th Cir. 2018, 2018 WL 5099603, at \*3-4 (finding that the ALJ improperly relied on normal exam findings as probative evidence that were divorced from claimant's pain). (\*Dr. Haskins' physical exams cited by the ALJ included taking vitals, listening to Ms. Montgomery's heart and lungs, and palpating her abdomen, lymphatics and extremities for abnormalities. (Tr. 683, 686, 781, 784, 811.))

[12] *See* fn. 9, *supra.* Ms. Montgomery's primary care provider, Diane Combs, M.D., also noted Ms. Montgomery's consistent complaints of fatigue and shortness of breath, and concluded they were related to her recurrent pulmonary emboli. (Tr. 1060, 1064, 1073, 1075, 1088, 1090, 1091.) She further assessed that Ms. Montgomery needed more evaluation for pulmonary arterial hypertension and nighttime hypoxemia (Tr. 1064, 1073.)

[13] *See* fn. 9, *supra.*

The ALJ's rejection of Dr. Haskins' opinion that Ms. Montgomery's pulmonary emboli continued to cause Ms. Montgomery shortness of breath and fatigue is most problematic. The Commissioner appears to take the position that anticoagulation therapy after 2011 prevented Ms. Montgomery from having pulmonary emboli and so also prevented her from having shortness of breath and fatigue associated with pulmonary emboli. Doc. 24 at 10, 15. Such a position would not be far-fetched and would carry force if it came from Dr. Haskins, the medical specialist who treated Ms. Montgomery for five years. But this position did not come from Dr. Haskins. Instead, it comes from the ALJ and contradicts the opinion of Dr. Haskins. As a result, it has no force. While the ALJ might disagree with Dr. Haskins' medical opinions, she is not free to disregard them in favor of her own. *Langley*, 373 F.3d at 1121 ("In choosing to reject the treating physicians' assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion.") (quoting *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002)).

The intermittent activities Ms. Montgomery has engaged in also provide an insufficient basis to totally reject Dr. Haskins' opinion regarding Ms. Montgomery's shortness of breath and fatigue. First, consider Ms. Montgomery's intermittent ability to ride her bicycle. Significantly, the bicycle rides to which the ALJ cited are in the medical record because Ms. Montgomery discussed them with Dr. Haskins. Thus, the ALJ was not presented with a situation where the weight of a treating physician's opinion should be reduced because the physician lacked relevant information when reaching the opinion. To the contrary, the bicycle rides formed part of the medical record on which Dr. Haskins based his medical opinion. It is the task of the treating

15

physician, not the ALJ, to reach medical conclusions based on the medical record, which, in this case, includes the bicycle rides at issue.

Further, while isolating the activities Ms. Montgomery reported she could do, the ALJ disregarded what Ms. Montgomery reported she could not do. On nineteen occasions she complained of, *inter alia*, fatigue, shortness of breath with exertion and/or difficulty with exercising. (Tr. 682-84, 685-86, 690-92, 693-95, 696-97, 698-700, 701-03, 707-08, 711-13, 714-16, 717-19, 720-21, 780-82, 783-84, 810-12, 852-53, 884-86, 913-155, 1108-1110.) This compares to the mere three occasions over a five-year period in which there is a record of Ms. Montgomery riding her bike.[14] When placed in context of the record as a whole, these three bicycle rides fall far short of justifying a total rejection of Dr. Haskins' opinions. *See Frey v. Bowen*, 816 F.2d 508, 516-17 (10th Cir. 1987) (finding that a claimant's daily activities of sitting, standing, walking and driving for brief intervals, and doing minor household chores, did not contradict a claim of disabling pain) (citing *Byron v. Heckler*, 742 F.2d 1232 (10th Cir. 1984) (finding that a claimant's jogging activity and intermittent work as a janitor were not inconsistent with complaints of pain, especially in light of medical source testimony regarding pain)); *Krauser*, 638 F.3d at 1333 (10th Cir. 2011) (finding that the specific facts of claimant's daily activities painted a very different picture than the generalities relied upon by the ALJ); *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993) (finding that sporadic performance of activities of daily living does not establish that a person is capable of engaging in substantial gainful activity); *see also Broadbent v. Harris*, 698 F.2d 407 (10th Cir. 1983) (holding that

---

[14] On October 15, 2013, she reported she had been able to ride her bicycle "up to 13 miles," but that it took her two hours. (Tr. 830.) On August 26, 2014, she reported riding her bicycle to her medical appointment, but expressed concern that it would be tough riding home because it was uphill. (Tr. 927.) On November 12, 2014, Ms. Montgomery reported she rode her bicycle 26 miles in a fundraising event, but that it took her "quite a period of time." (Tr. 914.)

16

sporadic diversions do not establish that a person is capable of engaging in substantial gainful activity); *Byron v. Heckler*, 742 F.3d 1232, 1235 (10th Cir. 1984) ("[i]n order to engage in gainful activity, a person must be capable of performing on a reasonably regular basis.").

Like her bicycle riding, Ms. Montgomery's work activities were intermittent. The ALJ discussed that Ms. Montgomery testified she "was working part-time at a restaurant and was helping her parents out in managing their properties." (Tr. 25.) The record demonstrates, however, that Ms. Montgomery testified that she averaged only four to ten hours per week working in retail sales at Cracker Barrel and had to keep calling "out" because she could not handle the hours. (Tr. 38.) Ms. Montgomery also reported to Dr. Haskins that she was very fatigued from her part-time job, and similarly reported to her mental health counselor she could barely make it to the end of her shift of just a few hours. (Tr. 1109.) Ms. Montgomery also testified that helping her parents out consisted of fielding maintenance calls for their apartment business when they were out of town and being available for emergency nighttime phone calls because her "dad can't deal with it anymore." (Tr. 39-41.) She testified she averages "5 to 10, maybe 15" hours a week helping her parents with the properties depending on whether her parents are out of town. (Tr. 50.) Ms. Montgomery further testified that she experiences fatigue helping her parents and will take naps in vacant apartments at their properties as needed or go home when she cannot do anymore. (Tr. 51.) In noting that "the claimant was working part-time at a restaurant and was helping her parents out in managing their properties" (Tr. 25), the ALJ filed to recognize the limited and intermittent nature of this work. While this work history is something the ALJ could consider in determining Ms. Montgomery's RFC and might also provide a basis to provide less then controlling wait to Dr. Haskins' opinions, it does not provide a sufficient basis to entirely reject them.

17

Similarly, because Dr. Haskins is not a mental health professional, the ALJ would be justified in giving less than controlling weight to Dr. Haskins' opinion about Ms. Montgomery's depression and anxiety. *Turley v. Sullivan*, 939 F.2d 524, 527 (8th Cir. 1991) (an ALJ need not give controlling weight to a physician's opinions on matters outside his expertise.). She was not justified, however, in totally rejecting his opinion; a treating physician's lack of expertise goes to the weight of the opinion. *Id.* Here, other medical providers agreed with Dr. Haskins that Ms. Montgomery's mental health impairments were playing a significant role in her pulmonary issues. (Tr. 824-26, 835, 1091.) *See* 20 C.F.R. 404.1527(c)(4) (explaining that the more consistent a medical opinion is with the record as whole, the more weight it will be given).

Further, the ALJ disregarded Dr. Haskins' opinions about mental impairments because those opinions were largely based on Ms. Montgomery's subjective complaints. However, a psychological opinion may rest either on observed signs and symptoms or on psychologist tests and constitute specific medical findings. *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004). Thus, Dr. Haskins' observations about Ms. Montgomery's mental impairments constituted specific medical findings and should not have been ignored. *Id.* (citing *Washington v. Shalala*, 37 F.3d 1437, 1441 (10th Cir. 1994)).

Finally, the ALJ erred in relying on the consultative report of State agency medical consultant Sylvia M. Ramos, M.D. to justify giving no weight to Dr. Haskins' opinions.[15] Dr. Ramos concluded that Ms. Montgomery appeared to be stable from her recurrent pulmonary emboli and assessed, without more, that Ms. Montgomery could "sit, stand, walk, lift, carry, handle small objects, hear, speak and travel." (Tr. 25, 758-59.) As a treating physician who saw Ms. Montgomery twenty-three times over a five-year period, however, the opinion of

---

[15] The ALJ accorded great weight to Dr. Ramos's opinion based on her professional expertise and explaining that it was not inconsistent with the objective evidence. (Tr. 26.)

Dr. Haskins should be afforded more weight than the opinion of Dr. Ramos, who only examined Ms. Montgomery one time. *See Robinson,* 366 F.3d at 1084 (explaining that absent a legally sufficient explanation, the opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all).

In addition, the portions of the medical record the ALJ cited do not accurately reflect the overall medical record. For instance, the ALJ failed to discuss that Dr. Ramos indicated further work up would be helpful to the evaluation, including laboratory studies, a psychological evaluation, and notes from Ms. Montgomery's primary care physician about her current diagnosis, response to treatment and prognosis. (Tr. 758.) The ALJ also inaccurately characterized the findings from Mayo Clinic and the University of Colorado as "essentially negative." But Dr. Badesch of the University of Colorado concluded that he could not completely exclude the possibility that Ms. Montgomery had pulmonary hypertension and RN Lynda Facchiano of Mayo Clinic (although finding no specific cause for Ms. Montgomery's shortness of breath) encouraged Ms. Montgomery to seek a psychiatric evaluation for possible anxiety and depression that "may be adding to her dyspnea." (Tr. 826, 835.) In other words, the examining medical source evidence the ALJ relied on as contradictory was inconclusive.

Based on the above analysis, the Court finds the ALJ did not follow the correct legal standards in considering Dr. Haskins' opinions, nor are the ALJ's reasons for completely rejecting his opinions supported by substantial evidence. *Langley*, 373 F.3d at 1121. This is reversible error.

### B. Remaining Issues

The Court will not address Plaintiff's remaining claims of error because they may be affected by the ALJ's treatment of this case on remand. *Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

### IV. CONCLUSION

For the reasons stated above, Ms. Montgomery's Motion to Reverse and Remand for a Rehearing With Supporting Memorandum (Doc. 21) is **GRANTED.** The Court reverses the Commissioner's decision denying Plaintiff benefits and remands this action to the Commissioner to conduct further proceedings consistent with this Opinion.

_____
**STEVEN C. YARBROUGH**
**United States Magistrate Judge,**
**Presiding by Consent**